On this case on document 2-16-0972, Abigail Strickland-Grosthuesch, Intendant Administrator for the Estate of Isabella Strickland-Romello, deceased Plaintiff Kathleen v. Edward Hospital, and all Defendant Contender Accountant. Arguing on behalf of the Defendant Contender Accountant, Mr. Hugh C. Griffith. Arguing on behalf of the Defendant Kathleen, Mr. Christopher D. Ford. Thank you. Mr. Griffith, on behalf of the appellant, you may proceed. Mr. Court, Counsel, Hugh Griffith on behalf of Edward Hospital. The appeal today involves Medical Studies Act protection for one redacted portion of Edward Hospital's Medical Staff Quality Committee case review forms. And that one redacted portion I submit is, quote, pure peer review. To quote the statute, what it consists of is a third party's confidential assessment of a healthcare practitioner's professional competence. Was that generated by a peer review committee? Yes, yes. How so? Well, there's a process, and it's set forth in the Edward Hospital charter, the MSQC charter and the bylaws, particularly on page 826 of our abstract, I think sets forth the core procedure by which this occurred. First, there has to be what they call a review indicator. And here it's undisputed that there were two review indicators. Mrs. Rosich called and made a complaint to the patient advocacy department of the hospital, and then unfortunately her daughter died while she was still a patient in the NICU unit. What the charter then says is that in the event of such a review indicator, I quote, the MSQC delegates to the clinical excellence department responsibility for initial screening and potential peer review. When a case is identified by clinical excellence as a peer review case, the MSQC authorizes the clinical excellence department to gather materials and information as necessary as part of the MSQC process. And that includes, in the very next line, obtaining confidential reviews and recommendations from consulting specialists on the medical staff. And the peer review policy then makes clear that everybody on the medical staff, all the physicians on the medical staff are subject to this provision and may be asked to review the care of a physician within their specialty. I'm trying to call out what you're saying. So to my way of thinking, what specific member of the hospital quality assurance committee authorized the investigation in this matter involving the plaintiff? What specific? Well, that's Nancy Rosenberg, and that's the specific person. She's designated by what order or by what request? She's designated by being a member of the clinical excellence committee. Her title is MSQC liaison. She's an ex-officio member of the committee. You rely primarily, principally, in your brief on IDE, right, versus Loyola University Medical Center? Yes. Well, that's what IDE is certainly about. Right. That stands for the proposition that before there's a committee, before we have a full meeting. All the other cases seem to go against your line of reasoning, that because the committee had not yet been formed, that there had been no action by the committee. But in IDE, because it was a designee who began the process, the act provided, covered it, and it was privileged. So where in what document does it say that Ms. Rosenberg was a designee of the MSQC to conduct investigations? Well, it says it right in what I've read to you. It doesn't have her name there, no. And it doesn't say designee? It says the MSQC delegates to the clinical excellence department. I would say that's a synonym for designee. And what would have been simple would be an affidavit from Ms. Rosenberg saying that she was directed. Right. Why isn't there an affidavit? Well, there's not one because this is the procedure that was filed. Well, we're talking about a specific case. It's your burden to establish privilege, would you agree? Right. And I would say that that provision in the charter substitutes for any affidavit that you want. If I could just refer to a rule. Did we just look at a charter from 2008 in light of cases from 2017? Are cases all go against your argument? I would submit they don't. If you look at a book, which I think we all agree is kind of the lead Supreme Court decision, and there you'll recall the chairman of the anesthesia department went around and got some information, and there was no showing that he had been authorized ahead of time to do that. And if I can quote the court at page 43, the bylaws contain no provision conferring on the chairman or any individual the authority to act from the department in conducting interviews or investigations preliminary to the review process. Here, I believe, in our chart, what I just read to you, is exactly what was missing in Roach. And Roach was before we even had the designee amendment to the statute. Doesn't Roach also say basically that if we allow a hospital to insulate themselves from disclosure virtually of all adverse facts known to its medical staff, that it basically goes against the intent of that legislation? Right. We don't have that issue today. We turned over the form. They have all the facts that were in that form. We initially did claim privilege on that. All we're claiming privilege on today is that one portion, which is undisputedly a peer-reviewed process by a member of the medical staff. So I want to, before I, if I may, make a point. Is it undisputed by who? Does counsel agree with that? I mean, that's what. Or not, I suppose. Well, obviously it's a redacted, it's redacted. But that's what it is. You have it. So you can obviously look to see that I'm right. But let's put aside this whole idea of the chronology. Let's just look at it's a peer-reviewed document. But wait, isn't this case distinguishable from I in that in I they named a designee? In this case there was not a designee named. The designee was the clinical excellence department. So it's not a specific person. But she, there's no dispute that she's within that category of people that's been designated as somebody that can take the preliminary investigation, including going to members of the medical staff and asking them to do an initial peer review of the conduct. So you're saying there's an ongoing authorization. Anybody involved in that particular staff, even though they're not specifically designated by the committee in some written document, then it's all privilege. What they, well, certainly the peer review portion. We haven't, you know, we know the tenor of the cases. So I didn't, you know, I'm not standing here saying this whole MSQC forum is protected. We turned it over. The only thing we're trying to get protection for is what is really peer-reviewed by another member of the staff who reviewed the care rendered to Mrs. Groshich and Isabella, two different people, and gave their opinions, recommendations, questions, et cetera, on that. You'll see when you go to the minutes, which are redacted, that that was the focus then of the committee when they did meet. So I was... How do you distinguish our most recent Medical Studies Act case, Nielsen? How do you distinguish Nielsen from this case? Because I sat on that panel, and Nielsen basically precludes designating in advance. Well, first of all, in Nielsen you found there's no investigation material involved. It's nurses giving an incident report of the facts. Again, we're not here today arguing that. We turned all that over. We turned the report over. The only thing we're arguing about is the actual peer review that went on and was then entered into the report and presented to the committee. But the peer review still has to fall within the parameters of the law. You can't just... Can you designate a whole department in advance as part of the peer review process, and then whatever anyone does in that staff is privileged? Is that what you're saying? I'm not saying that today. All I'm saying today is that part which involved them going to another physician on the staff and saying, Would you review the care of these physicians? And then putting that in the report. But was that authorized at the initial? That's the question. Not that they did it. You can't bootstrap it later because it ended up being part of what you call the process. Who authorized her to do that? Period. You're saying it's an advanced directive, right? That's what you're saying in your hand? An advanced delegation, yes. I don't know any case that says that's improper. Roche said we're looking for that. We can't find it. I think Nielsen said that. I think we said in Nielsen that Edwards Hospital was... Nielsen, was it? Swedish? I can't remember. It was Swedish. Swedish. Was too broad. Too broad. That was way too broad. How is this not too broad when it doesn't specify who is going to begin this peer review? It specifies where... It doesn't have a name. It doesn't have a name. It doesn't mean it doesn't mean. It's a science that you have to do. Members of this Clinical Excellence Committee could change, but nobody's arguing that Mrs. Rosenberry wasn't within the scope of the committee and wasn't acting within the scope of the delegation. But I've got to make one point. Again, I'm only here today arguing about this one little portion, which is peer review. I've got to take you to Anderson. If you recall, Anderson said, We don't care about chronology. We're not even going to let you have the medical journals that the committee reviewed because that's going to review the internal working processes of the committee. In our DeSana First District case, the court again said, The material we're talking about served an integral function in the peer review decision-making process. It's protected, quote, based now with staining. All right. This one narrowed your argument that you keep emphasizing to one specific portion that you say is clearly and indisputably part of the peer review process. Yes. Okay. Who generated this document you're referring to? Mrs. Rosenberry picked two physicians on the staff. Right. She then got their input, put it into the MSQC report, and that's all of it. The court will probably concededly be fine if, in fact, Mrs. Rosenberry was a designee specifically by the committee, but I think that's what we're wrestling with. Now, what document other than your general directive before, there was no specific document that says, Hey, you are hereby authorized pursuant to this, you know, authorization to conduct this. There's nothing you have. I believe this document at 826 does that. Not by name. Not by name, right. So it comes down to whether or not we find that general directive sufficient to comply with the medical studies. Even if you don't, that's a point you've got to make. You've got to go to Anderson and understand. But Anderson is for the articles, medical articles, correct? And they basically said that the content from those articles was not protected because that was written well before, but the suggestion of what articles to use was protected. Right. Right. But that's a little different than what we have here. I want to know how is this case different from Nielsen? Nielsen didn't involve peer review. You said there's nothing here about an investigation. It's just incident facts from a nurse. Yeah, but they tried to bootstrap it to a peer review committee the same way. I agree, but I'm just saying one of the reasons you said it doesn't work is these aren't investigative materials. There's no investigation going on. That's how Justice Jorgensen concluded her opinion. Right. It's just factual. It's just an incident report. That portion of our form, I'm not standing here trying to protect. We turned all that over. How many Medical Studies Act cases are out there, if within the past probably, what, four to five years? Right. How many? Fifteen. When are the hospitals going to figure out what they have to do to find something and make something first? Well. I mean, they keep teetering around the law and hoping that we're going to figure that whatever we're doing, even if it's broad, is going to be a privileged piece of information. I mean, I'm on the bench. I'm not practicing law or medicine, but one would think that if you took all these cases and honed them down, you would figure out what has to be done. But none of these cases involve what we're doing here, which is an actual peer review undertaking before the committee meeting. But can you have peer review prior to the convening of peer review committee? Well, sure. Sure you can. The goal is to do it expeditiously. Right. So if you had to wait for a peer review committee to meet, you would defeat that purpose of doing it expeditiously. You've got to get scheduling. You have to pick the crew that's going to be reviewing. Right. You've got to do all those. So while those procedural steps are going, your argument is that the hospital should be allowed under the policies to have the peer review begun. Yeah, but under the statute, you're not allowed to do that. Under the statute, the Medical Studies Act doesn't allow you to insulate with these materials by doing it prior to a peer review committee being convened. And how is a peer review committee convened in this case? The peer review committee was convened in March and April after this document was prepared because the committee had already delegated the initial investigation authority in this charter to members of the Clinical Excellence Committee. The committee delegated. The MSQC did. Right, and they're the review committee. There's no case that says they do not have the right to make a delegation ahead of time as to who's going to conduct the initial investigation. The problem that I see from the record in this case is, as Justice Hudson pointed out, there's no document, there's nothing, there's no affidavit saying that Nurse Rosenberry was the committee's designee. Well, the affidavit says that the investigation was carried out pursuant to and in accordance with this. Right. Now, couldn't we have added an affidavit? You know, you had that opportunity. But I don't know what it would have added really to the facts that we have before us. Thank you very much. All right, thank you, Mr. Griffin. You'll have an opportunity to address the Court again in rebuttal. Mr. Ford, on behalf of the Appalooh. Thank you, Your Honor. Your Honor, Justices, respected counsel, Ms. Banks, I believe the crux of the hospital's grief is that the trial court failed to apply a 20-year-old amendment, which he probably looks at several times every year. And I think nothing's further from the truth. I think the only place this was overlooked was in the affidavits, respectfully. In the original ruling, Judge Sutter not only was clearly aware of the amendment but stated so on the record. And then after being addressed questions about why he was making this ruling, he specifically told the defense counsel, you need to, you could point out in your affidavit, quote, who in that committee maybe launched that investigation, then you're protected under the Medical Studies Act. He also indicated to them that there was nothing indicating that the investigation had begun. When they brought their motion for reconsideration, rather than listening to what Judge Sutter had clearly laid out for them, they added nothing to the supplement affidavit that indicated that an investigation had commenced, that someone was designated to authorize Ms. Rosenberry, that Ms. Rosenberry was, in fact, a designee. None of that is in there. There's a mention here in the argument about the Clinical Excellence Department with a citation to the policy, and respectfully, that's nowhere in the affidavit. The words Clinical Excellence Department don't even appear in the affidavit. Well, what if they, I mean, the crux of this argument seems to be, look, we with an advance directive could direct members of that department to conduct the investigation. Even if we were to construe the record broadly, if that carried the day anyway, can you do that? No, I respectfully don't believe so. The issue was raised in the Chicago Trust case. In the Chicago Trust case, the court specifically said, quote, the hospital seems to be saying that its HOC can invoke the act's protection by declaring in advance that all incident documents prepared by the hospital staff are part of a peer review process. The hospital goes too far. Such a policy, if effective, would swallow the rules. Seems to be his argument, isn't it? Pardon me? It would seem to be his argument if they had some advance directive to the members of this department as being part of the peer review process. That's correct. And the 2nd District in Copeland adopted the Chicago Trust case. So this has been the law in the 2nd District for a long time. And I think the court essentially directed the defense counsel how an affidavit could succeed for them. And in the motion for reconsideration, they ignored its direction. So the only thing I can assume is that they have 100% control over their affidavits. I don't have a chance to address those. I can only assume that they didn't put it in the affidavit because they couldn't put it in the affidavit. You would agree that there's nothing in the Medical Studies Act that prohibits a committee from designating someone to conduct investigations, correct? There's nothing in the act that precludes that. No, I don't think the act precludes it. I think that the affidavit should be. The affidavit was not sufficient. It was insufficient. We don't know. You know, Ms. Rosenberry's defined is called a liaison. I don't know, as I sit here today, what that means. We don't know if there's 5 or 100. That's true. It could be. It's not a defined term in any of their policies. She's not called a member of the clinical lessons department. Her designation in the affidavit has no relationship to the policies. And I assume that if they could make that connection, it would have been done, at least in supplement to that affidavit after his honor suitor told them that that's what they should do. But it wasn't done, so I have to assume it wasn't done because it couldn't be done. And as in I, which is a case they rely upon. I mean, that's really the crux of the argument. But if you read I, I really lays out what a hospital needs to do to succeed on these motions. And if you look at it, almost every step of I was missed in these affidavits. If you follow Chicago trust and couple of it, which I'm familiar with those cases. Their logic would be in the logic of those cases, why the hospitals would be that everything is privileged except the medical reports. If you were allowed to proceed the way that they wanted to proceed, Chicago trust couple of this case. Right. I'm sorry. Basically, everything would be privileged except the medical records. I think that's true. And I think that's exactly what, what all these cases have been telling us for years. They, their entire, you know, this protection can be important. As a plaintiff's attorney, I agree it has an important in our system. However, it can't be used so broadly that, you know, as a plaintiff's attorney, you're relying on facts. And in a case like this, of this nature, the case can turn on one or two facts. And if that's what's in, and I'm in the blind here. I've been fighting this battle for over a year. And I don't even know what's in, and there's two redacted sections now on. And I don't know what's in there. But what I do know is that. The redacted sections are the notes that we're taking, correct? Yes. And there's two of them actually, not just one. The conversations with the doctors. Yes, there's one relating to an obstetrical portion, one relating to a pediatric portion. And as a plaintiff's attorney, the thing that keeps us awake at night is the statute of limitations. And in this case, this child died on November 1st, 2013. Care was October 13th and November 1. The ruling in the trial court was in August of last year, over a year ago. Even if this court rules expeditiously and sends a mandate to the trial court, and I get this thing a month from now, that leaves me one month to evaluate those things. And I don't know what's in there. There may be something in there. There may be nothing. I may have been fighting this battle for no reason for a year and a half. But there may be something in there that causes me concern, and I have almost no time left. So respectfully, they can succeed by delaying where they couldn't succeed by following the law. And that's what really concerns me. And I'm not sure what I can do about it. It's the first interlocutory appeal I've ever had to come up on. And it's of significant concern to me, what's in those. And so I just respectfully had to make that comment because With regard to the appeal, you do not believe that this appeal was taken in good faith, based on your arguments just now that this was done for the sole purpose of delay. Well, respectfully, Your Honor, I don't know what happens if interlocutory appeals occur, and it's a common occurrence that they're used for delay. But what I do know is I've read these affidavits, and I know what Judge Sutter told them to do in the first hearing. It wasn't done. And he said specifically this motion to reconsider is not well taken. I'm paraphrasing, but he commented on it. Yeah, he said that he didn't believe he was confused, I think is what he said in the ruling, in the first time, and I don't think he was. And so I have great respect for my opponent. Mr. Griffin has known him a long time. I don't mean to say anything in that regard. But what I do know is this has placed my client and myself in a pretty precarious position and doesn't make me happy. And I don't see any other reason that this appeal could have been taken, given what is contained in these affidavits. These affidavits are ñ well, I think I've said enough. I don't think I have anything more to say. Thank you very much. You'll have to turn it over. Thank you. All right, Mr. Griffin, you may approach the Court in rebuttal. Thank you. We seem to be two ships passing in the night. Justice Shostak, of course, you're correct on what you called a tidal truss. We understand what these cases have been saying. That's why we didn't ñ that's why we turned over the report. All we're trying to say is there's one portion we can't turn over. Why is that portion separate and distinct from the other portions, Mr. Griffin? First of all, under Anderson, it's going to show you the internal processes of the committee. Because that went to the committee. You have the redacted minutes. That was the focus of the committee meeting, what those initial peer reviewers said. They then reacted to what was said, made their final recommendations and conclusions. Their comments on the care. And that went to the committee. And if Anderson spilled the law where you said, hey, I'm not going to let you know about that treatise because you might figure out from that treatise what the internal machinations were of the committee. This is that in multiple times. Do you also rely on that Artisana case? You have Artisana. Absolutely. The Court said, based on what we've got here as a case review form, it doesn't exactly say what the contents were. In Nielsen, you described it as probably being recommendations and conclusions with regard to the peer review, which, again, is exactly what we have here. So you're saying it's the content. I'm saying I can live with – I still think the chronology is fine. But if it isn't, all I'm saying is if Anderson and Artisana are the law – and by the way, I relied on them heavily in my brief and my court. They never address them. They didn't mention them. So there's a two-pronged basis from my argument. If the chronology isn't right, if the epitaph didn't say enough, okay, we turned over the report. We didn't try to say everything's protected. Here's everything except. I understand exactly what you're saying. But that's my question. How do you separate? So if the Medical Studies Act says that something is not privileged because of the chronology, the time that it was released, you know, then how is it that you can pick and choose what in the report should not be released? Well, again, to take you back to Anderson, there's nothing in the Medical Studies Act that says, hey, a medical journal prepared 20 years ago is protected. But you saw – They said that the content wasn't protected. That wasn't the content. It was the report – the articles themselves. I'm not going to let you get something that gets to the internal processes of community. This one segment of this report that we're fighting about here will take you directly, and you have the documents. And you made that argument before the trial court? The same argument you're making here about these documents, now it's getting – Well, I wasn't in the trial court. There was that argument. We certainly cited all the cases. I don't know that this argument was expressly made, but I thought you might ask that. I've got a case for you. 1010 Lakeshore v. Dusha Bank, 215-011-8372, paragraph 18. This court only requires parties whose observations are claims to appeal. They are not required to limit their arguments to the same ones made in the trial and appellate courts. So whether it was fleshed out to the extent I am doing now, I would say it may not have been. But it's still there. I mean, it doesn't go away. I mean, Anderson and Artisano made clear that the documents there, they weren't going to let them be discovered regardless of the chronology because they were going to show the internal process of the committee. That's why we came back on re-hearing. We said, Judge, okay, we will turn these case review forms over. We first said we wouldn't. But we just need to redact this one portion because, again, as I started, it's pure peer review. That's what it goes to. And that can't be revealed if we're going to stick with what you held at Anderson and Artisano. And I still come out of the other side. I don't know if you said, well, you could have had an affidavit from Ms. Rosenberry, but all she covered, he said, was I acted pursuant to his policy. Well, counsel's comment. Could you address counsel's comment that it's impossible to basically ignore Judge Souter's directives? Well, what Judge Souter said, I believe he said, is you didn't come in here with an affidavit from somebody, a chairman or somebody like I, on a committee, to say that, hey, I called Mrs. Rosenberry and told her to do this. And so I don't think, from at least the record, I don't believe that. I don't believe that happened. What happened is what I read to you in the charter. There was two review indicators. Ms. Rosenberry saw that, saw that her charge was to conduct the investigation. She did so. Thank you very much for your hearing. So I'd like to thank both counsel for the quality arguments here this morning. No matter what course we take it under advisement, a written decision will enter into force, hopefully expositiously. We stand adjourned for the day subject to call. Thank you.